ANDRÉ BIROTTE JR.
United States Attorney
ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division
JAMES A. BOWMAN
Assistant United States Attorney
California Bar Number 220227
      1100 United States Courthouse
      312 North Spring Street
      Los Angeles, California 90012
      Telephone: (213) 894-2213
      Facsimile: (213) 894-6269
      E-mail: James.Bowman@usdoj.gov

Attorneys for Defendant
United States of America

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>               Plaintiff,<br><br>            v.<br><br>DAVID KAUP,<br><br>               Defendant. | No. CR 12-195-MMM<br><br>**GOVERNMENT'S SENTENCING POSITION FOR DEFENDANT DAVID KAUP; DECLARATION OF JAMES A. BOWMAN AND EXHIBITS**<br><br>Date:  December 17, 2012<br>Time:  1:15 p.m. |

        Plaintiff United States of America, by and through its

counsel of record, Assistant United States Attorney James A.

Bowman, hereby files its sentencing position with respect to

defendant David Kaup.  This sentencing is supported by the

attached memorandum of points and authorities, the Declaration

of James A. Bowman and related exhibits, statements from the

victims in this case (which have been filed separately with the

1  Court under seal), and such further evidence and argument as the

2  Court may permit at the sentencing hearing, currently set for

3  December 17, 2012 at 1:15 p.m.

4  Dated:  November 26, 2012        Respectfully submitted,

5                                   ANDRÉ BIROTTE JR.
                                     United States Attorney
6                                    ROBERT E. DUGDALE
                                     Assistant United States Attorney
7                                    Chief, Criminal Division

8                                        /s/
9                                    JAMES A. BOWMAN
                                     Assistant United States Attorney
10                                   Attorneys for Defendant
                                     United States of America

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## TABLE OF CONTENTS

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . .   1

II.   ADVISORY SENTENCING GUIDELINES . . . . . . . . . . . .   3

      A.    Base offense level . . . . . . . . . . . . . . .   3

      B.    Loss Calculation and Number of Victims . . . . . . .   3

            1.    Stipulations in the Plea Agreement . . . . . .   3

            2.    Loss from the Lunden Investments Fraud Scheme .   4

            3.    The Probation Officer's Loss Calculation . . .   5

      C.    Acceptance of Responsibility . . . . . . . . . . .   5

      D.    Other Adjustments . . . . . . . . . . . . . . . .   5

      E.    Criminal history category . . . . . . . . . . . .   6

      F.    Total offense level and guideline range . . . . .   7

III.  A SENTENCE OF 78 MONTHS IN PRISON IS REASONABLE AND
      APPROPRIATE UNDER THE 3553(A) FACTORS . . . . . . . . .   7

      A.    Nature and Circumstances of the Offense . . . . . .   7

            1.    Defendant's Conduct . . . . . . . . . . . . .   8

            2.    Impact on Victims . . . . . . . . . . . . . .   8

                  i.    Statements from Victims of American Loans
                        and Funding . . . . . . . . . . . . . .   9

                  ii.   Statements from Victims of First Mortgage
                        West . . . . . . . . . . . . . . . . . .  10

      B.    History and Characteristics of Defendant . . . . .  12

      C.    Need for Deterrence and to Promote Respect for
            the Law . . . . . . . . . . . . . . . . . . . . . .  13

      D.    Policy Statements and Need to Avoid Sentencing
            Disparities . . . . . . . . . . . . . . . . . . . .  15

IV.   RESTITUTION AND FINE . . . . . . . . . . . . . . . . . .  16

V.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . .  17

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

Defendant David Kaup awaits sentencing after pleading guilty to two counts of wire fraud based on two separate advanced fee schemes which collectively defrauded 52 victims out of more than $1.7 million.  Defendant also admitted to defrauding clients of his earlier investment company, Lunden Investments, out of approximately $9 million.  These crimes have had a devastating impact on the victims, and the government respectfully requests that the Court sentence defendant to 78 months in prison for his crimes.

The crimes that defendant perpetrated against the victims were despicable.  First, through Lunden Investments, defendant duped investors into giving him $9 million, which he said would be used to generate profits by funding various loans.  Instead, defendant lost the victims' money by trading on the Foreign Currency Exchange Market.  Defendant then shut down the company and declared bankruptcy.

After this first fraud, defendant knew that no one would give him money for investments.  So defendant instead devised an advance fee scheme that preyed on needy homeowners who sought assistance in refinancing their homes.  Through a new company, American Loans and Funding ("ALF"), defendant told homeowners that he could secure loans for them at below-market interest rates, as long as the victims sent him funds equal to one year worth of mortgage payments up front.  Believing defendant's guarantees that these funds would be kept safe, and would be returned when the loan process was complete, at least 23 victims

1  sent defendant over $1 million - including money they were using
2  to pay for their children's tuition, from their savings and
3  retirement accounts, or that they had borrowed from their family
4  and friends.  Defendant did not even try to obtain loans for
5  them.  Instead, he lost most of their money on the Foreign
6  Currency Exchange Market and squandered the rest of it on luxury
7  items for himself.  After defendant had lost or spent all of the
8  victims' money, he shut down ALF and moved on to a new scheme.

9      To get even more funds from unsuspecting victims, defendant
10  and his co-conspirators started a new company, First Mortgage
11  West ("FMW"), that defrauded homeowners through the same scheme
12  that he had run at ALF.  By the time defendant left FMW, he had
13  defrauded another 29 victims out of more than $700,000.

14      This sentencing position includes excerpts from a number of
15  victims, taken from statements that were submitted by
16  approximately 44 victims of defendant and his companies.  These
17  statements provide wrenching evidence about the impact that
18  defendant's fraud has had on these victims.  In many cases, the
19  victims' lives were irrevocably damaged because they had the
20  misfortune of seeing an advertisement for defendant's services
21  and contacted defendant or one of his conspirators.

22      The PSR calculates defendant's total offense level as 26
23  and his criminal history category as I, with a resulting
24  advisory guideline range of 63 to 78 months in prison.  The
25  government agrees with the PSR's guideline calculation, which is
26  consistent with the parties' stipulations in the plea agreement.
27  The parties further stipulated in the plea agreement that a
28  sentence of 78 months in prison (the high end of the guideline

range) was appropriate under the factors set forth in 18 U.S.C.
§ 3553(a).  A sentence of 78 months in prison is sufficient, but
not greater than necessary, to reflect the seriousness of the
crimes that defendant perpetrated on the victims, defendant's
lack of respect for the law, and the need to deter defendant
from carrying out predatory fraud schemes in the future.

The government therefore respectfully requests that the
Court sentence defendant to 78 months in prison, a three year
period of supervised release, and pay a special assessment of
$100.[1]  The government further requests that the Court order
defendant to pay the victims a total of $10,761,736 in
restitution to the victims of all three schemes.

## II.   ADVISORY SENTENCING GUIDELINES

### A.   Base offense level

The government, defendant, and the Probation Officer agree
that the base offense level for defendant's offenses of
conviction (wire fraud) is governed by § 2B1.1(a), and that the
base offense level for these offenses under that guideline is 7.
PSR ¶ 34.

### B.   Loss Calculation and Number of Victims

#### 1.   Stipulations in the Plea Agreement

The parties stipulated in paragraph 15 of the plea
agreement that an enhancement of 16 levels under U.S.S.G.
§ 2B1.1(b)(1)(H) (loss to the victims between $1 million and
$2.5 million) was appropriate based on the losses that defendant
and his conspirators caused to the victims of defendant's

---

[1] The government concurs with the PSR's conclusion that defendant
lacks the financial ability to pay a criminal fine.  PSR ¶ 102.

-3-

advance fee schemes.   The parties also stipulated that an enhancement of 4 levels under U.S.S.G. § 2B1.1(b)(2) was appropriate because defendant defrauded more than 50 victims. Plea Agt. ¶ 15.   Additionally, defendant admitted in the factual statement of his plea that he defrauded approximately 52 victims out of a total of approximately $1,755,970.  Fact. Stmt. ¶¶ 6, 11.

> 2.   Loss from the Lunden Investments Fraud Scheme

Defendant also admitted that he defrauded victims of Lunden Investments out of approximately $9 million.   In exchange for his guilty plea to wire fraud counts connected to ALF and FMW, as well as his agreement to pay full restitution to the victims of Lunden Investments, the government agreed not to prosecute defendant for this fraud scheme.   Plea Agt. ¶ 4(c).   Defendant's conduct in connection with Lunden Investments can, however, be considered by the Court in determining the applicable Guidelines range, the propriety and extent of any departure from that range, and the appropriate sentence under the factors set forth in 18 U.S.C. § 3553(a).   Id.   The government does not have sufficient information to conclude that the Lunden Investments scheme should be considered as relevant conduct for the purposes of calculating loss under the Guidelines, and for that reason stipulated to only a 16 level enhancement for loss based on losses to the victims of ALF and FMW.   As is discussed below, however, the government believes that defendant's fraud on the victims of Lunden Investments should be considered as an aggravating factor under the Section 3553(a) factors.

///

-4-

3.   The Probation Officer's Loss Calculation

The PSR concluded that defendant and his conspirators caused a total of $1,791,737 in losses to the victims of ALF and FMW.  PSR ¶¶ 26, 35 (see also Victim List attached to the PSR). The PSR also concluded that a four-level enhancement under U.S.S.G. § 2B1.1(b)(2) was appropriate because defendant defrauded more than 50 victims through American Loans and Funding and First Mortgage West.  PSR ¶ 36.

C.   Acceptance of Responsibility

After learning of the government's investigation, defendant pled guilty to two counts of wire fraud related to ALF and FMW. Defendant also admitted in his factual statement to defrauding victims through those schemes, as well as defrauding the victims of Lunden Investments out of $9 million.  The parties therefore agree, and the PSR concurs, that a reduction of three levels under U.S.S.G. § 3E1.1(b) is appropriate for defendant's acceptance of responsibility.

D.   Other Adjustments

Defendant played a leadership role in the FMW advance fee scheme.  After ALF shut down, defendant recruited co-defendant Ron Alex Hernandez to start FMW so that he could continue to steal money from homeowner victims.  Defendant also helped co-defendant Montani locate a broker to use as a cover for the business, find and set up an office, set up bank accounts for the company, prepare supposed loan contracts for the clients, and file forms with the state of California.  See Declaration of

-5-

1   James A. Bowman, Exhibit A (Montani Proffer Statement) at 2-3.[2]

2   Defendant also arranged for co-defendant Montani to set up a

3   brokerage account in Montani's name so that defendant could use

4   the victims' funds to trade on the Foreign Currency Exchange

5   Market.  Id.  Defendant also arranged for First Mortgage West to

6   obtain an "A" rating from the Better Business Bureau.  Id. at 6.

7   The parties therefore stipulated, and the PSR concurs, that a

8   two level enhancement for defendant's leadership role in the

9   offense under U.S.S.G. § 3B1.1(c) is appropriate.  Plea Agt.

10  ¶ 15; PSR ¶ 42.

11      **E.   Criminal history category**

12      The PSR includes detailed summary of defendant's criminal

13  history.  PSR ¶¶ 51-58.  Aside from a number of juvenile arrests

14  and convictions (which included arrests for such felonies as

15  forgery and residential burglary, as well as for misdemeanor

16  drug possession, petty theft, and burglary), defendant was

17  convicted in 2012 for assault.  PSR ¶¶ 52-55.  The assault

18  conviction results in one criminal history point, with a

19  resulting criminal history category of I.  PSR ¶ 58.

20  ///

21  ///

22

23  _____

24  [2]   Defendant Montani was provided limited "queen for a day"
    immunity in connection with his interview with the United States
    Attorney's Office and agents of the FBI.  This immunity

25  agreement, among other things, precludes the government from
    using defendant Montani's statements against him at trial or in

26  connection with his sentencing.  His statements can, however, be
    used in connection with the sentencing of defendant Kaup.  They

27  are offered in this sentencing position for that purpose only,
    and should not be considered in any way in determining the

28  appropriate sentence for defendant Montani.

                                -6-

## F.   Total offense level and guideline range

The above calculations result in a total offense level of 26 with a criminal history category of I, with a resulting advisory guideline range of 63 to 78 months in prison.

## III.  A SENTENCE OF 78 MONTHS IN PRISON IS REASONABLE AND APPROPRIATE UNDER THE 3553(A) FACTORS

### A.   Nature and Circumstances of the Offense

#### 1.   Defendant's Conduct

*"The crime was extremely well thought out and pre-planned. ... It was so elaborate that the forms were extremely official looking, the way I was contacted and ongoing communications were similar to prior experiences I had [with banking and refinancing]."* – victim Mark M. (age 55, commodity manager)

Defendant pled guilty to two serious fraud schemes.  Over a period of several years, defendant stole money from hard working families.  He then lost most of that money trading on the Foreign Currency Exchange Market and squandered the rest.

Defendant's actions were not the result of a single lapse in judgment or impulsive behavior.  It took a great amount of planning, effort, and attention to detail to deceive the victims.  The victim statements reflect that many of the victims were educated professionals – lawyers, scientists, doctors and accountants.  It is a testament to defendant's skill and intelligence that he could deceive these victims into believing that they were dealing with a bona fide mortgage brokerage firm. Several victims wrote that they were astonished to find out that ALF and FMW were scams because all of their conversations with defendant, and the forms used by those companies, were consistent with a real mortgage business.  Defendant even took

-7-

steps to ensure that FMW had the top rating from the Better
Business Bureau, retaining a mortgage broker with a high rating
to be the broker affiliated with the company.

The fact that defendant carried out these predatory schemes
over a long period of time, with careful planning and execution,
is a factor that weighs heavily in favor of a substantial prison
sentence.

### 2.   Impact on Victims

*"We made a lot of sacrifices in saving this money and
the thought of these crooks just taking / stealing
[from] us literally makes me sick to my stomach."* –
victims Patrick H. (40, software developer) and Angie
N. (registered nurse)

Defendant's crimes caused irreparable harm to many victims.
Because the victims believed that their money would be returned
within one month, they sent defendant money that they could not
afford to lose.  Given the harm caused by defendant's fraud, it
would be a serious crime even if only one victim or family had
been affected.  But defendant operated his scheme on a large
scale, defrauding more than 50 victims.

The government sent notices regarding defendant's
sentencing to victims who lost money to ALF and FMW and invited
them to provide their information to the Court.  To date, the
government has received 43 responses from these victims, as well
as a statement from one of the victims of Lunden Investments.
The government has reviewed these statements and provides
excerpts from some of them below, describing in the victims' own
words what has happened to them since the fraud was uncovered.
Although they represent only a fraction of the victims who lost

-8-

money, their stories provide a vivid picture of the impact of defendant's crime:

        i.   <u>Statements from Victims of American Loans and Funding</u>

   <u>Victim Madelene F., 47, is an administrative assistant in New York and lost $27,057</u>.  She explained that "*[t]his money was being saved for my 12 year old daughter, who has multiple learning disabilities.*"  Because defendant stole that money, Madelene had to pull her daughter out of a special education school.  She said she cannot understand "*how some people just take money away from hard working people.  It took us so long to save that money and now it's gone.*"  But mostly, Madelene feels bad for her daughter, "*who didn't do anything to anybody and this was what happened to her.*"  When Madelene contacted defendant to try to get her money back, defendant suggested that she "*try and get a loan.*"

   <u>Victims Thomas H., 52, and Melanie H., 46, live in Tennessee.  They lost $20,598.35 to defendant</u>.  They explained that this money came from "*a life insurance disbursement that we received from the death of our son.*"  They said that they had intended to refinance in order to prepare for retirement.  As a result, this "*basically wip[ed] out all our savings.*"  They reported that they still do not understand why defendant stole from them: "*It's very difficult to understand how these things can happen and why they would prey on average folks to steal money from.*"

///

Victim Robin H., 48, is a housewife in Colorado.  She lost $115,516.80 to defendant.  She explained that "*[t]he money we sent to ALF was our entire savings that we had saved for the past 4 years to re-finance our house as well as pay for private speech therapy for our 5 year old, adopted daughter.  Upon losing all of our savings, we needed to discontinue her existing therapy and try to re-build our savings.*"  As a result, Robin said she feels "*anger, shame, embarrassment, and hopelessness.*"

>    ii.   Statements from Victims of First Mortgage
>          West

Victim Harriet K. (age 83), an accountant, lost $19,565 to FMW.  Harriet said that she told the representative from FMW that she and her husband would have to withdraw money from their retirement accounts to send to the company, and that the company representative assured them that the money would be returned. She noted that "*[i]t is especially disturbing that these people have stolen money from elderly people who rely on their pensions to survive in retirement.*"

Victims Carol C. (43) and Jack C (ages 49), lost $90,000. The money they sent to FMW came from an IRA that Carol C.'s husband had saved from working in construction since 1986. Because the money came from an IRA, and was not returned within 60 days, they had to pay an additional ten percent penalty above the money that they lost.  As a result, they were forced to sell their home at a loss and move to a different neighborhood. Their middle school son had to change schools when they were forced to move.  Carold C. said that "[we] *were both raised by*

-10-

1   our parents to be good citizens ... to be kind to others, to

2   take care of your elders and the little guys, etc. which is how

3   we are raising our two boys.  We are trustworthy and expect that

4   same trait in others.  What these men have done is destroy our

5   faith in mankind and yet we do not want that to be ingrained in

6   our children."

7       Victim Nicholas P. (age 58), is semi-retired and lost

8   $36,677.  He said that the money he lost to FMW "was to use for

9   our retirement that we had to take from our savings."  As a

10  result, he reports that "[I] can't trust others anymore.  I have

11  lost confidence in myself.  My wife wants to leave me."

12

13                *      *      *      *      *

14

15  In summary, the victim statements make clear that defendant's

16  crime caused:

17      1)    Severe financial pressure from losing their savings;

18      2)    Delayed retirement, as many victims have had to
              continue to work beyond their targeted retirement to
19            make up for the losses they suffered;

20      3)    Inability to pay for expenses, including college
              tuition or educational expenses for children, mortgage
21            payments, or credit card payments;

22      4)    Money that had been borrowed to make the "seasoned
              funds" payment to ALF and FMW;
23

24      5)    Terrible emotional consequences, including loss of
              trust and increased strain on family relationships;
25            and

26      6)    Lost time and money, including legal fees and costs,
              attempting to recover the money they lost to
27            defendant.

28

                              -11-

The victims came from all across the country and were typical working families who had hoped to ease their financial pressures by refinancing their home loans with American Loans and Funding and First Mortgage West.  As many as nine of the victims who submitted statements reported being retired or close to retirement.  Some also suffered from disabilities that likely prevent them from being able to start over and replace the funds they lost to defendant and his companies.  Each victim's statement makes clear that the victims in this case worked very hard, for a long time, to earn the money that defendant stole from them.

**B.   History and Characteristics of Defendant**

> *"David is so smooth.  This is the 4th time he has done this. ...  It was a scam from the start.  Pure evil. ...  Don't be fooled by his words, smiling face, or sweet talk."* - victim Richard S. (42, forest fire analyst)

Defendant did not commit the crimes in this case out of necessity, nor were his actions in this case aberrational conduct.  There is no evidence in the PSR, including in the information provided by defendant, that his actions were the product of financial distress or other significant hardships in his life.  Instead, the facts provided in the PSR reflect that defendant had the family support and intellectual ability to have led a productive life without resorting to the fraud he carried out on the victims in this case.

Defendant chose a different path.  He started Lunden Investments and stole $9 million from the victims of that scheme.  When he lost the victims' money, he declared

-12-

bankruptcy, closed the business, and moved on to a new scheme.
Many of the victims of ALF and FMW reported that they spoke
directly with defendant, and that he knew that they were using
money from their savings to send to ALF.   Nevertheless,
defendant pressured the victims to send their money to him.   As
one victim explained:

> David kept reminding me that if I didn't get the money
> together [for the seasoned funds], and the 3
> appraisals which I had to pay for myself, I would lose
> the loan.   He scared us and backed us into a corner
> until they received our money.   [He] knew we were
> desperate.

(Statement of victim Regina S.)

Defendant's willingness to steal money from these families,
knowing that they would suffer if they lost their savings,
reflects an almost pathological level of callousness.
Defendant's disregard for the harm that he caused to the victims
from each scheme weighs strongly in favor of a substantial
prison sentence.

### C.   Need for Deterrence and to Promote Respect for the Law

> "How will the justice system prevent these criminals
> from further crime?" - victim Nicholas P. (age 58,
> retired)

The government's recommended sentence is also necessary to
protect the community and to deter defendant from committing
similar crimes in the future.

Defendant has demonstrated that he has absolutely no
respect for the law, or for the victims who he defrauded.
Defendant took nearly $9 million from his investor clients at
Lunden Investments and squandered their money on the Foreign

1   Currency Exchange Market.  After he was forced to close that
2   company, and declare bankruptcy, defendant was not deterred.
3   Instead, he started a new scheme and took steps to conceal his
4   involvement with the company (using aliases and putting the
5   company in another individual's name).  He also knew that no one
6   would invest money with him after Lunden Investments, so he lied
7   to the victims and told them that he would help them refinance
8   their homes.  After he had again lost or spent all of the
9   victims' money from that scheme, defendant shut down the company
10  and started a new company, again taking steps to conceal his
11  involvement.  Defendant's repeated fraud demonstrates that he
12  poses a high risk of recidivism and that a substantial prison
13  sentence is needed to deter him from committing additional
14  crimes in the future.

15      A substantial sentence is also needed to promote respect
16  for the law and deter others from engaging in similar fraud
17  schemes.  As the Court is no doubt aware, large fraud schemes
18  (including similar advance fee schemes that prey on homeowners
19  seeking to refinance their homes or obtain loans) have become
20  more and more prevalent in the past few years.  Defendant
21  carried out his schemes on a large scale, defrauding victims
22  across the country.  The sentence imposed in this case should
23  therefore not only be sufficient to deter defendant, but should
24  also be sufficient to deter others from engaging in similarly
25  predatory schemes.
26  ///
27  ///
28

-14-

### D.  Policy Statements and Need to Avoid Sentencing Disparities

> "*The public perception is that punishment for financial fraud and white-collar crimes are relatively lenient.  The culprits get away with paying [a] penalty which amounts to only a very small fraction without admitting guilt or complicity for the true extent of the crime perpetrated.*" – victim Matthew P. (age 66, unemployed)

The guideline range represents the Sentencing Commission's determination that a defendant who is a leader of two fraud schemes that causes more than $1 million in losses to more than 50 victims through a fraud scheme, but who accepts responsibility by pleading guilty, can expect to serve between 63 and 78 months in custody.  Following a guidelines sentence is normally a means to avoiding disparity between similarly-situated defendants.

The government's recommended sentence also takes into account the sentence that this Court imposed on defendant's conspirator, Ron Alex Hernandez, for his role in the FMW fraud scheme.  Hernandez had a significant criminal history (his prior convictions resulted in a criminal history category of IV), but played a lesser role in the scheme than defendant Kaup.  Kaup ran the Lunden Investments and ALF schemes on his own, and Hernandez only became involved when defendant recruited him to start FMW.  This Court sentenced Hernandez to 70 months in prison for his role in the FMW scheme.  Based on the significantly greater role that defendant played in the FMW

-15-

scheme, as well as his prior schemes, the government believes that defendant Kaup should receive a higher sentence than his co-conspirator Hernandez.

Thus, the government believes that its recommended sentence of 78 months in prison is not only supported by the Sentencing Commission's policy statements, but also reflects the need to avoid sentencing disparity among the defendants in this case.

## IV.   RESTITUTION AND FINE

"*I want my money back, even if it means all their personal assets are to be liquidated.*" - victim Mark M. (commodities manager).

The government concurs with the PSR's conclusion that defendant lacks the financial ability and resources to pay a criminal fine. PSR ¶ 102.

The government also concurs with the PSR's calculation that defendant should pay $1,791,737 in restitution to the victims of ALF and FMW (for the time period that defendant was involved with that company), as detailed in the Victim List attached to the PSR. See PSR ¶¶ 26, 124. Defendant admitted in the factual statement of his plea agreement that he defrauded the investors of Lunden Investments out of approximately $9 million and agreed to pay full restitution to those victims. The bankruptcy petition for Lunden Investments lists approximately 11 victims who lost a total of $8,970,000. See Bowman Decl., Exh. B (October 10, 2008 Bankruptcy Petition) at 8-10. The government therefore requests that the Court order defendant to pay an

-16-

1  additional $8,970,000 in restitution to the victims of Lunden

2  Investments, for a total of $10,761,736.

3  **V.  <u>CONCLUSION</u>**

4      For the foregoing reasons, the government respectfully

5  requests that the Court impose a sentence of 78 months in prison

6  – which is a sentence at the high end of the guideline range.

7  The government further requests that the Court sentence

8  defendant to three years of supervised release, no fine, and a

9  special assessment of $100.  Finally, the government requests

10 that the Court order defendant to pay $10,761,736 in restitution

11 to the victims of ALF, FMW, and Lunden Investments.

12 Dated:  November 26, 2012      Respectfully submitted,

13                               ANDRÉ BIROTTE JR.
                                 United States Attorney
14                               ROBERT E. DUGDALE
                                 Assistant United States Attorney
15                               Chief, Criminal Division

16

17                               /s/
                                 JAMES A. BOWMAN
18                               Assistant United States Attorney
                                 Attorneys for Defendant
19                               United States of America

20

21

22

23

24

25

26

27

28

                              -17-